No. 12-2484

———————————————

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

———————————————

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

*Appellant*,

*v.*

FORD MOTOR COMPANY,

*Appellee*.

———————————————

On Appeal from the United States District Court
for the Eastern District of Michigan, Southern Division
Case No. 5:11-cv-13742-JCO-MAR

———————————————

## SUPPLEMENTAL EN BANC BRIEF OF
## APPELLEE FORD MOTOR COMPANY

———————————————

Elizabeth P. Hardy
KIENBAUM OPPERWALL HARDY
  & PELTON, P.L.C.
280 North Old Woodward Avenue
Suite 400
Birmingham, Michigan 48009
(248) 645-0000

Helgi C. Walker
  *Counsel of Record*
Jonathan C. Bond
Marisa C. Maleck
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 955-8500
HWalker@gibsondunn.com

*Counsel for Appellee Ford Motor Company*

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to 6th Circuit Rule 26.1, Appellee Ford Motor Company makes the following disclosure:

**1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:**

Ford Motor Company states that it has no parent corporation.  State Street Corporation, a publicly traded company whose subsidiary State Street Bank and Trust Company is the trustee for Ford common stock in the Ford defined contribution plans master trust, has disclosed in filings with the U.S. Securities and Exchange Commission that as of December 31, 2013, it holds 10% or more of Ford's stock.  The following is a list of publicly traded domestic and foreign companies in which Ford Motor Company directly or indirectly owns an equity interest of at least 10%, but less than 100%:  (1) China-Jiangling Motors Corporation, Limited and (2) Turkey-Ford Otomotiv Sanayi Anonim Sirketi (Otosan).

**2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:**

No.

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT ............................................................................................3

I.    REGULAR ATTENDANCE IN THE WORKPLACE WAS AN ESSENTIAL
      FUNCTION OF HARRIS'S RESALE-BUYER JOB ......................................3

      A.    Under Well-Settled Law, Regular, In-Person Attendance
            Was An Essential Function Of Harris's Interactive,
            Problem-Solving Job ..............................................................3

            1.    Regular, In-Person Attendance Is Essential For Most
                  Jobs...........................................................................3

            2.    An Employer's Business Judgment That Regular, In-
                  Person Attendance Is Essential Merits Deference ......................6

            3.    Both The Requirements Of Harris's Resale-Buyer Job
                  And Ford's Reasoned Business Judgment
                  Demonstrate That Regular, In-Person Attendance Is
                  Essential .....................................................................8

      B.    The EEOC's Claim That A Reasonable Jury Nevertheless
            Could Find That Harris Was "Qualified" Has No Basis In
            The Record ........................................................................12

            1.    No Evidence Supports The EEOC's Conjecture That
                  Harris Could Perform All Essential Job Functions
                  From Home ................................................................12

            2.    Ford's Policy And Practice Support Its Judgment That
                  Harris's Proposal To Telecommute Was Unreasonable ..........14

            3.    Harris's Opinion Cannot Defeat Summary Judgment ..............16

## TABLE OF CONTENTS
### (continued)

**Page**

   4. Summary Judgment Is Appropriate Where, As Here, The Evidence Demonstrates That Regular Attendance In The Workplace Is Essential ..................................................17

  C. It Was Harris's Burden To Propose Other Accommodations, And The Only Alternatives The EEOC Identifies Were Unworkable ..........................................................................19

II. THE RECORD CASTS NO DOUBT ON FORD'S REASON FOR TERMINATING HARRIS:  POOR PERFORMANCE.....................................24

CONCLUSION .........................................................................................25

STATUTORY & REGULATORY ADDENDUM ............................................ A-1

 42 U.S.C. § 12111................................................................... A-1

 42 U.S.C. § 12112................................................................... A-4

 42 U.S.C. § 12203................................................................... A-9

 29 C.F.R. § 1630.2 ................................................................. A-9

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) ..................................................................6

*Brenneman v. MedCentral Health Sys.*,
366 F.3d 412 (6th Cir. 2004) ............................................... 4, 17

*Brickers v. Cleveland Bd. of Educ.*,
145 F.3d 846 (6th Cir. 1998) ...................................................4

*Carr v. Reno*,
23 F.3d 525 (D.C. Cir. 1994) ............................................... 5, 19

*Colón-Fontánez v. Municipality of San Juan*,
660 F.3d 17 (1st Cir. 2011) ......................................................5

*Davis v. Fla. Power & Light Co.*,
205 F.3d 1301 (11th Cir. 2000) ...............................................5

*DePaoli v. Abbott Labs.*,
140 F.3d 668 (7th Cir. 1998) ...................................................7

*Dropinski v. Douglas Cnty.*,
298 F.3d 704 (8th Cir. 2002) .................................................16

*EEOC v. Yellow Freight Sys., Inc.*,
253 F.3d 943 (7th Cir. 2001) ...................................................5

*Feist v. La. Dep't of Justice*,
730 F.3d 450 (5th Cir. 2013) .................................................24

*Gantt v. Wilson Sporting Goods Co.*,
143 F.3d 1042 (6th Cir. 1998) ............................................ 4, 18

*Hankins v. The Gap, Inc.*,
84 F.3d 797 (6th Cir. 1996) ...................................................21

*Harris v. Metro. Gov't of Nashville & Davidson Cnty.*,
594 F.3d 476 (6th Cir. 2010) .................................................24

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Henschel v. Clare Cnty. Rd. Comm'n,*
  737 F.3d 1017 (6th Cir. 2013) ............................................................ 4, 11, 18

*Huber v. Wal-Mart Stores, Inc.,*
  486 F.3d 480 (8th Cir. 2007) ........................................................................23

*Hypes ex rel. Hypes v. First Commerce Corp.,*
  134 F.3d 721 (5th Cir. 1998) ..........................................................................5

*Jakubowski v. Christ Hosp., Inc.,*
  627 F.3d 195 (6th Cir. 2010) ........................................................................21

*Jones v. Nationwide Life Ins. Co.,*
  696 F.3d 78 (1st Cir. 2012) .............................................................................7

*Keever v. City of Middletown,*
  145 F.3d 809 (6th Cir. 1998) ........................................................................21

*Kleiber v. Honda of Am. Mfg., Inc.,*
  485 F.3d 862 (6th Cir. 2007) ..........................................................................4

*Mason v. Avaya Commc'ns, Inc.,*
  357 F.3d 1114 (10th Cir. 2004) ................................................ 2, 5, 7, 17, 19

*Melange v. City of Ctr. Line,*
  482 F. App'x 81 (6th Cir. 2012) ............................................................. 4, 18

*Pesterfield v. TVA,*
  941 F.2d 437 (6th Cir. 1991) ........................................................................23

*Rauen v. U.S. Tobacco Mfg. Ltd. P'Ship,*
  319 F.3d 891 (7th Cir. 2003) ..........................................................................5

*Rorrer v. City of Stow,*
  743 F.3d 1025 (6th Cir. 2014) ............................................................... 7, 18

*Samper v. Providence St. Vincent Med. Ctr.,*
  675 F.3d 1233 (9th Cir. 2012) .....................................................................4, 5

*Sch. Bd. of Nassau Cnty. v. Arline,*
  480 U.S. 273 (1987) .........................................................................................4

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*,
    444 F.3d 961 (8th Cir. 2006) ..................................................................5

*Smith v. Ameritech*,
    129 F.3d 857 (6th Cir. 1997) ................................... 4, 9, 15, 18

*Smith v. Davis*,
    248 F.3d 249 (3d Cir. 2001) ...................................................................5

*Solomon v. Vilsack*,
    763 F.3d 1 (D.C. Cir. 2014) ........................................... 18, 19

*Tyndall v. Nat'l Educ. Ctrs. Inc.*,
    31 F.3d 209 (4th Cir. 1994) ...................................................................5

*U.S. Airways, Inc. v. Barnett*,
    535 U.S. 391 (2002) ................................................................................23

*United States v. Jones*,
    132 S. Ct. 945 (2012) .............................................................................6

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    133 S. Ct. 2517 (2013) .........................................................................24

*Vande Zande v. Wis. Dep't of Admin.*,
    44 F.3d 538 (7th Cir. 1995) ...................................................................5

*Vandenbroek v. PSEG Power CT LLC*,
    356 F. App'x 457 (2d Cir. 2009) ..........................................................5

*Whitman v. Am. Trucking Ass'ns, Inc.*,
    531 U.S. 457 (2001) ................................................................................8

## Statutes

42 U.S.C. § 12101 .......................................................................................1

42 U.S.C. § 12111 ......................................................................... 4, 6, 8

42 U.S.C. § 12112 .......................................................................................3

42 U.S.C. § 12203 .....................................................................................24

# TABLE OF AUTHORITIES
## (continued)

<u>Page(s)</u>

**Regulations**

29 C.F.R. § 1630.2 ................................................................................8

**Other Authorities**

EEOC, *Work at Home/Telework as a Reasonable Accommodation*,
   http://www.eeoc.gov/facts/telework.html (last updated Oct. 27, 2005)....... 11, 22

## INTRODUCTION AND SUMMARY OF ARGUMENT

In work and life alike, there is simply no substitute for showing up. That is especially true for jobs that require solving urgent problems, working with others as a team. That principle is deeply rooted in this Court's and other circuits' precedent holding that the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, generally does not entitle employees to work predominantly from home on an unpredictable schedule of their choosing. Case law also confirms that an employer's judgment about the essential functions of a job—including the need for regular attendance in the workplace—is entitled to deference.

Those straightforward, settled principles should make short work of this case. Jane Harris held a job with Appellee Ford Motor Company as a resale buyer—a problem-solver at a key juncture in Ford's steel supply chain—which required frequent, often impromptu interactions with others, including to address unanticipated emergencies. Both Ford's managers and Harris's coworkers attested that such interactions are most effective if done face-to-face. The job also requires visits to suppliers' facilities, which by definition cannot be done from home. Ford therefore was amply justified in concluding that predictable, in-person attendance is essential for resale buyers, and no genuine issue of material fact required that Harris's claim to the contrary should be put to a jury. Indeed, Ford twice allowed Harris to telecommute on a trial basis, but the trials and Ford's other efforts to help

Harris succeed in the job were to no avail—and Harris rejected Ford's repeated efforts to accommodate her, including its offer to find her another job at Ford suitable for telecommuting. The ADA did not require Ford to accept Harris's demand to work from home most of the week on an unpredictable basis.

The district court correctly reached just that conclusion and also rejected Appellant EEOC's claim that Ford's termination of Harris was retaliatory. The EEOC urges reversal, but offers no reason to reject settled law that regular attendance in the workplace is essential and that an employer's view merits deference. And it ignores actual evidence of the resale-buyer job's requirements, relying instead on unsupported conjecture and the employee's personal opinion.

The EEOC's position, at bottom, is that *every* case in which the employee disagrees with her employer about a job's essential functions must go to a jury. That is refuted by this Court's cases resolving this issue at the summary-judgment stage. The EEOC's view, moreover, would invert the employment relationship by making *employees* the summary-judgment-masters of the requirements of their own jobs. Employers should not have to litigate to trial the importance of coming to work; juries are ill-equipped to sit as "super personnel department[s]."[1]

The Court should reject the EEOC's contrary view and reaffirm that most jobs, including Harris's, require regular attendance in the workplace and that an

---

[1] *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004) (internal quotation marks omitted).

employer's judgment on that issue merits deference. And it should illustrate proper application of those principles by affirming the district court's sensible decision.

## ARGUMENT

### I. REGULAR ATTENDANCE IN THE WORKPLACE WAS AN ESSENTIAL FUNCTION OF HARRIS'S RESALE-BUYER JOB.

Two principles deeply rooted in this Circuit's and others' case law resolve this appeal: Regular attendance in the workplace is an essential function of most jobs, and an employer's judgment that a job function is essential is entitled to deference. The district court, applying both principles, correctly held that the ADA did not require allowing Harris to work from home up to four days per week on an *ad hoc* basis. The EEOC's contrary claims cannot be squared with those principles or the record.

#### A. Under Well-Settled Law, Regular, In-Person Attendance Was An Essential Function Of Harris's Interactive, Problem-Solving Job.

##### 1. Regular, In-Person Attendance Is Essential For Most Jobs.

To prevail on its discrimination claim, the EEOC undisputedly bore the burden of establishing (*inter alia*) that Harris was "qualified" for the resale-buyer position, 42 U.S.C. § 12112(a), including that she "c[ould] perform the essential functions of the employment position" "with or without a reasonable accommoda-

3

tion," *id.* § 12111(8).[2]  "A job function is essential if its removal would fundamentally alter the position."[3]

This Court has long held that for most jobs, regular attendance in the workplace is essential.  "'An employee who cannot meet the attendance requirements of the job at issue cannot be considered a "qualified" individual'" who can "perform the essential functions of the job."[4]  It is only in the "'unusual case'" where an "'employee can effectively perform *all* work-related duties at home'" that the ADA may excuse an employee from predictable, in-person attendance.[5]

This principle is deeply rooted in ADA case law across the country.  Indeed, *every circuit* to consider the issue agrees that regular attendance in the workplace is

---

[2]  *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007).

[3]  *Henschel v. Clare Cnty. Rd. Comm'n*, 737 F.3d 1017, 1022 (6th Cir. 2013) (internal quotation marks omitted).  The EEOC at times frames the issue as whether Harris's proposed *ad hoc* telecommuting plan was a reasonable accommodation, without regard to whether regular, in-person attendance was an essential function. Appellant Supp. Br. ("Supp. Br.") 5-8 (D.E.107).  So framing the issue does not change the analysis, however, because the "ADA does not demand that an employer exempt a disabled employee from an essential function of the job as an accommodation." *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998); *cf. Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 n.17 (1987).  Because Harris's proposed accommodation would excuse her from regular, in-person attendance, the Court must determine whether that was an essential job function. *See Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1240 (9th Cir. 2012).

[4]  *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) (citation omitted); *accord Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 419 (6th Cir. 2004); *Melange v. City of Ctr. Line*, 482 F. App'x 81, 84 (6th Cir. 2012).

[5]  *Smith v. Ameritech*, 129 F.3d 857, 867 (6th Cir. 1997) (emphasis added) (citation omitted).

4

an essential function of most jobs.[6]  Jobs that can be performed entirely from home—instead of in person, at the worksite designated by the employer—are the exception, not the rule.[7]  That is especially true for jobs that require teamwork.[8]

The EEOC does not dispute that this Circuit and others have long deemed regular attendance in the workplace essential for most jobs.  Instead, the EEOC invited the panel to abandon that precedent as "outdated," based on unspecified "technological advances," Appellant Br. 19 (D.E.30)—and the panel's now-vacated opinion did so based on concurring opinions addressing starkly different

---

[6] *See Colón-Fontánez v. Municipality of San Juan*, 660 F.3d 17, 33 (1st Cir. 2011) ("'attendance is an essential function of any job'"); *Vandenbroek v. PSEG Power CT LLC*, 356 F. App'x 457, 460 (2d Cir. 2009) ("regularly attending work is an essential function of virtually every job" (internal quotation marks omitted)); *Smith v. Davis*, 248 F.3d 249, 251 (3d Cir. 2001) ("[a]n employee who does not come to work on a regular basis is not 'qualified'"); *Tyndall v. Nat'l Educ. Ctrs. Inc.*, 31 F.3d 209, 213 (4th Cir. 1994) ("a regular and reliable level of attendance is a necessary element of most jobs"); *Hypes ex rel. Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) (per curiam) (same); *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 949 (7th Cir. 2001) (en banc) ("'Common sense dictates that regular attendance is usually an essential function in most every employment setting.'"); *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006) ("'[r]egular and reliable attendance is a necessary element of most jobs'"); *Samper*, 675 F.3d at 1237 ("'if one is not able to be at work, one cannot be a qualified individual'"); *Mason*, 357 F.3d at 1119 ("physical attendance in the workplace is itself an essential function of most jobs"); *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1306 (11th Cir. 2000) ("job presence … has been held to be an essential function of a job"); *cf. Carr v. Reno*, 23 F.3d 525, 530 (D.C. Cir. 1994) ("an essential function of any government job is an ability to appear for work (whether in the workplace or, in the unusual case, at home)").

[7] *See, e.g., Mason*, 357 F.3d at 1124; *Rauen v. U.S. Tobacco Mfg. Ltd. P'Ship*, 319 F.3d 891, 896-97 (7th Cir. 2003); *Tyndall*, 31 F.3d at 213.

[8] *See Samper*, 675 F.3d at 1237; *Mason*, 357 F.3d at 1120, 1122; *Hypes*, 134 F.3d at 727; *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995).

contexts.[9]  In its en banc brief, however, the EEOC does not renew that invitation, and offers no reason to break from other circuits and settled precedent by deeming predictable attendance in the workplace optional.

Nor is there such a reason.  The central insight of this Court's and other circuits' decisions—that showing up for work on a predictable basis is essential *unless* all essential duties can be done effectively off-site—remains valid and vital to the workplace.  To be sure, technology enables some workers to perform some or even all tasks remotely.  But the rule applied by this Circuit and others already accounts for that possibility.  Unless *all* essential job tasks can be done remotely, however, one who cannot predictably attend work is not "qualified."

### 2.   An Employer's Business Judgment That Regular, In-Person Attendance Is Essential Merits Deference.

It is likewise well settled that an employer's judgment that a job function is essential is entitled to deference.  In fact, the ADA expressly mandates that "consideration shall be given to the employer's judgment as to what functions of a job are essential."  42 U.S.C. § 12111(8).  Courts accordingly "giv[e] a 'significant degree' of deference to an employer's business judgment about the necessities of a

---

[9]  *See* Panel Op. ("Op.") 10 & n.2 (D.E.87) (citing *United States v. Jones*, 132 S. Ct. 945, 955 (2012) (Sotomayor, J., concurring) (Fourth Amendment and electronic surveillance), *id.* at 957 (Alito, J., concurring in the judgment) (same), and *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 259 (2002) (Thomas, J., concurring in the judgment) ("virtual" child pornography)).

job."[10]   As the panel opinion noted, courts "routinely defer to the business judg-ment of employers."[11]   So long as a requirement is applied evenhandedly, courts "do not otherwise second-guess the employer's judgment" that it is essential.[12]

It follows that an employer's judgment that a job function can be done effec-tively only in person merits deference.  A job cannot be done from "anywhere" (Op. 10) if, in the employer's judgment, it is essential that some tasks be done *at the office*.  In other words, it is for the employer to define the "workplace."

Deferring to the employer's judgment makes perfect sense.  The employer, after all, creates a job to fulfill a business need, and thus has the best perspective on what aspects of it are essential and where they can be performed effectively. Courts, in contrast, "are not equipped with the institutional knowledge to sit as 'su-per personnel department[s].'"[13]   And it would wreak havoc to "allow *employees*" themselves "to define the essential functions of their positions based solely on their personal viewpoint and experience."  *Mason*, 357 F.3d at 1122 (emphasis added).[14]

---

[10]  *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 88 (1st Cir. 2012) (citation omitted); *see also Mason*, 357 F.3d at 1122.

[11]  Op. 11.

[12]  *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998).

[13]  Op. 11 (quoting *Mason*, 357 F.3d at 1122).

[14]  *Rorrer v. City of Stow*, 743 F.3d 1025 (6th Cir. 2014), on which the EEOC re-lies, Supp. Br. 3, is not to the contrary.  *Rorrer* stated only that courts need not de-fer to an employer's judgment when "there is a genuine dispute of material fact on the issue," 743 F.3d at 1042, which does not exist here.  To the extent *Rorrer* could be read as rejecting deference to employers' judgment more generally, it would not bind the en banc Court, and would be contrary to settled case law and the ADA.

The EEOC rejoins that, notwithstanding this settled law, the EEOC's own regulation makes the employer's view just one among multiple other considerations, Supp. Br. 3 (citing 29 C.F.R. § 1630.2(n)(3))—which, with one exception (a written job description, if any exists), are not mentioned in the statute, *see* 42 U.S.C. § 12111(8). To be sure, other factors might be relevant in assessing the reasonableness of an employer's judgment. But that is no basis to reduce the employer's perspective to practical irrelevance, as the EEOC proposes, by ranking it as just one data point easily outweighed by others, and indeed placing the employee's opinion on par with the employer's judgment to defeat summary judgment. That would contravene Congress's mandate to give meaningful "consideration" to the employer's views of a job's essential functions. Any statutory interpretation that gives primacy to criteria that Congress did *not* enumerate, while relegating a factor the statute *does* mention to an afterthought, is manifestly unreasonable.[15]

### 3. Both The Requirements Of Harris's Resale-Buyer Job And Ford's Reasoned Business Judgment Demonstrate That Regular, In-Person Attendance Is Essential.

The well-settled principles that regular, physical attendance is essential for most jobs and that the employer's judgment merits deference are dispositive here.

---

[15] *Cf. Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 464-71 (2001). In any event, the EEOC fails to show that any other relevant criterion in its regulation overcomes Ford's judgment. For example, the "experience" of other past and current resale buyers (29 C.F.R. § 1630.2(n)(3)(vi)-(vii)) confirms Ford's judgment that regular, physical attendance is essential. *Infra* p. 9 & n.19. And the "consequences" (29 C.F.R. § 1630.2(n)(3)(iv)) of excusing employees from it are severe.

The resale-buyer job that Harris held is not the "'unusual'" position (*Smith*, 129 F.3d at 867 (citation omitted)) in which all or even most core tasks can be performed from home.  Appellee Br. ("Ford Br.") 26-32 (D.E.34).  Resale buyers are troubleshooters at a critical link in Ford's supply chain, responsible for maintaining an uninterrupted supply of (in this case) steel for vehicle-parts manufacturers ("stampers").  R.60-2, Gordon Decl. ¶¶ 3-5, PgID 1027-28.  Upon receiving a request for steel from a stamper, they first identify a supplier and arrange a purchase.  But that is just the beginning:  Resale buyers must make sure the stamper actually receives what is needed.  That requires addressing unpredictable shortages in steel supply—which occurred increasingly due to "turmoil" in the steel industry in 2008 and 2009—and other emergencies.  *Id.* ¶¶ 3-4, 6, PgID 1027-28.[16]

The "essence" of this "highly interactive" job is "group problem-solving," and it therefore often requires meetings with coworkers, suppliers, and others.[17] As Ford managers testified, these interactions are performed most effectively face-to-face.[18]  Other resale buyers agreed.[19]  In-person interactions are so critical that

---

[16] *See also* R.60-8, Pompey Decl. ¶¶ 8-10, PgID 1094; R.60-15, Kane Decl. ¶ 10, PgID 1139 ("In any shortage situation, it is the responsibility of the resale buyer to interface with the various stake holders … and find solutions.").

[17] R.60-2, Gordon Decl. ¶¶ 5, 11, PgID 1028, 1034; *see also* R.60-8, Pompey Decl. ¶ 8, PgID 1094; R.60-9, Radl Decl. ¶ 4, PgID 1097.

[18] R.60-2, Gordon Decl. ¶ 11, PgID 1034; R.60-5, King Dep. 48, PgID 1057; *see also* R.60-3, Gontko Decl. ¶ 4, PgID 1043.

[19] R.60-8, Pompey Decl. ¶¶ 8, 11, PgID 1094-95; R.60-9, Radl Decl. ¶¶ 4-5, PgID 1097-98.

9

Ford requires that buyers "physically work in the same building" as stampers "so that they are able to quickly meet and respond to any urgent situations."  R.60-15, Kane Decl. ¶ 10, PgID 1139.  Resale buyers are "often" deployed for supplier site visits to meet with suppliers,[20] sometimes even to "watch … part[s] being made."[21]

Although some of these interactions can be scheduled in advance, many occur on an impromptu basis.  Because the purpose of in-person team meetings is often to address urgent, unanticipated problems, they are frequently "unplanned" and occur on the "spur of the moment."[22]  The "environment" is thus "very fluid," and resale buyers are, due to the need to interact directly with others, "barely at [their] desk[s]."  R.60-5, King Dep. 43, PgID 1056.  As one attested, "[t]here is no way of knowing what a given day will bring since emergencies are beyond the buyer's control and require, on [a] moment's notice, that the buyer put aside what they are doing to interact with … stakeholders."  R.60-8, Pompey Decl. ¶ 9, PgID 1094.  Regular, physical attendance is also crucial to resale buyers' supervisors, who need to "know who [they] c[an] rely upon during the course of any given day to assist with spur of the moment issues that required problem-solving dialogues."  R.60-2, Gordon Decl. ¶ 7, PgID 1029.  Scheduling events in advance, moreover, would not

---

[20]  R.60-8, Pompey Decl. ¶ 8, PgID 1094; *see* R.60-2, Gordon Decl. ¶ 5, PgID 1028.

[21]  R.60-5, King Dep. 43-44, 46, PgID 1056-57.

[22]  R.60-2, Gordon Decl. ¶¶ 7, 11, PgID 1029, 1034.

have helped Harris, as she was unable to "predict … what days she would be in the office."[23]

Predictable, in-person attendance thus is essential to the resale-buyer job, and eliminating that requirement—by permitting predominant, *ad hoc* telecommuting, as Harris requested—would "'fundamentally alter'" (*Henschel*, 737 F.3d at 1022 (citation omitted)) the position.  Indeed, the EEOC's own guidance shows that the job is ill-suited for frequent telecommuting, stating that "critical considerations" in deciding whether to allow telework "include whether there is a need for face-to-face interaction and coordination … with other[s]" and "whether in-person interaction with outside colleagues, clients, or customers is necessary."[24]

Any doubt on this score is erased by deferring to Ford's "reasoned business judgment" that regular, in-person attendance is essential to the resale-buyer job. R.68, S.J. Order 12, PgID 1401.  Ford concluded that the job "does not lend itself to frequent, unpredictable workdays out of the office," and that face-to-face interactions are crucial for doing the job "effectively" and "efficiently,"[25] which Harris's coworkers corroborated, *supra* p. 9 & n.19.  Those conclusions—and Ford's determination of the appropriate workplace—deserve deference.

---

[23]  R.60-4, Jirik Decl. ¶ 8, PgID 1049; R.67-3, Harris Dep. 140-46, PgID 1384-86.

[24]  EEOC, *Work at Home/Telework as a Reasonable Accommodation*, Question #4, http://www.eeoc.gov/facts/telework.html (last updated Oct. 27, 2005).

[25]  R.60-2, Gordon Decl. ¶¶ 5, 11, PgID 1028, 1034; R.60-3, Gontko Decl. ¶ 4, PgID 1043; R.60-5, King Dep. 44, PgID 1056.

**B.    The EEOC's Claim That A Reasonable Jury Nevertheless Could Find That Harris Was "Qualified" Has No Basis In The Record.**

Notwithstanding these well-settled principles and the overwhelming evidence, the EEOC contends that summary judgment is inappropriate.  A jury, it argues, could find that predictable, in-person attendance was not essential for Harris's job and that her proposal to telecommute up to four days per week on an *ad hoc* basis was reasonable.  *See* Supp. Br. 3-8.  But the EEOC cites no record evidence on which a reasonable jury could properly base such a finding—and indeed none exists.  At bottom, its argument ultimately rests on Harris's own opinion, which cannot suffice to defeat summary judgment.  The EEOC's claim that this and nearly every similar case must go to trial contravenes this Court's case law and, if adopted, would subject employers to tremendous and unjustified burdens.

**1.    No Evidence Supports The EEOC's Conjecture That Harris Could Perform All Essential Job Functions From Home.**

The EEOC insists that summary judgment is improper because "[a] reasonable jury could find that Harris could have performed all essential functions" of her resale-buyer job "while teleworking."  Supp. Br. 6.  But it cites no record evidence from which a jury could reasonably arrive at that conclusion.

The EEOC first claims that Harris's inability to participate in face-to-face meetings with coworkers and others is immaterial because "[a] jury could find that Harris would be just as accessible from home."  Supp. Br. 7.  But all it cites is the

vacated panel opinion, *id.*, which cited nothing supporting its conclusion that "Ford's concern with scheduling meetings and knowing who could be relied upon to handle urgent matters … did not depend on Harris's physical presence in the office," Op. 14.  Neither the panel opinion nor the EEOC identified any evidence rebutting Ford's judgment that in-person attendance is crucial because, among other reasons, "face-to-face interactions facilitate group problem-solving."  *Id.* at 11.

The EEOC also speculates that a jury could find that Harris's inability to attend supplier site visits on a reliable basis was insignificant.  Supp. Br. 8.  But again, it cites no evidence from which a reasonable jury could make that finding.  It cites nothing in the record to refute Ford's showing that site visits were a frequent and necessary part of Harris's resale-buyer job.  *Cf. supra* p. 10.  The EEOC likewise cites nothing to refute the fact that Harris's request to telecommute up to 80% of the week—on an entirely unscheduled basis—would make her availability unknowable from one day to the next.  *Cf. id.*, pp. 10-11; Ford Br. 10-12, 37-38.[26]  No reasonable jury could find an employee was "qualified" who admittedly cannot reliably perform a key function.

---

[26]  The EEOC claims that there is no evidence Harris was "routinely forced … to cancel site visits."  Supp. Br. 8.  But even without permission to telecommute at will, Harris missed work *most* of the time.  *See* Ford Br. 9; *infra* p. 20.  Moreover, how frequently her prior absences fell on site-visit days does not affect her undisputed inability to attend them reliably in the future.  Indeed, Harris and the EEOC conceded that she might be unable to attend supplier meetings, and would simply "call and reschedule" them—as if having *timely* meetings was irrelevant to her job functions.  R.66-10, Apr. 2009 Mtg. Notes, PgID 1319; Appellant Br. 9 (D.E.30).

### 2.   Ford's Policy And Practice Support Its Judgment That Harris's Proposal To Telecommute Was Unreasonable.

The EEOC argues that Ford's telecommuting policy and practice undermine Ford's judgment that regular, in-person attendance is essential.  Supp. Br. 4.  But Ford's policy and practice if anything prove the opposite, and in all events do not suggest that Harris's request to telecommute on an *ad hoc* basis was reasonable.

The EEOC cites Ford's telecommuting policy (Supp. Br. 4), but omits key parts.  The policy states that "[n]ot all jobs or individuals will be appropriate for telecommuting."  R.60-11, Ford Policy 3-4, PgID 1104-05.  And the first identified "characteristi[c]" of a task "suitable for telecommuting" is that it "[r]equires little unscheduled face-to-face contact," *id.*, which is not true of resale buyers.  The policy also requires an "agreed upon work schedule," which, as the "Telecommuting Agreement" shows, means a *prearranged* plan for hours to be worked at home each day.[27]  And even "an employee with an approved telecommuting arrangement should be prepared to come into the office on telecommute days when the business or management requires it."[28]  Harris's request was flatly contrary to Ford's policy.

---

[27]  R.60-11, Ford Policy 2, 15, PgID 1103, 1116.

[28]  R.60-4, Jirik Decl. ¶ 7, PgID 1048.  The EEOC cites Harris's testimony that she was told before being hired that the resale-buyer job was suitable for telecommuting.  Supp. Br. 4.  Even taking Harris's account at face value, she did not claim that she was ever told that she could work from home up to four days a week on an unpredictable basis.  R.60-6, Harris Dep. 152-55, PgID 1062-63.  Harris admitted that the supervisor with whom she spoke "didn't go into … detail" about how many days per week she might be allowed to telecommute.  *Id.* at 154-55, PgID 1063.

The EEOC also notes that Ford has permitted some resale buyers to tele-commute. Supp. Br. 4. But as the EEOC concedes, none did so more than one or two days per week. *Id.* And, as the record reflects, each resale buyer committed to attending work in person on particular, prescheduled days each week.[29] Ford's practice thus reinforces its judgment that predictable, in-person attendance is nec-essary and that excusing Harris from it was unreasonable. Indeed, that resale buy-ers have been permitted to telecommute only up to two days per week on a fixed schedule (with the understanding that their schedule was subject to change based on business needs)—whereas Ford's policy allows up to four days per week (under appropriate circumstances), *see supra* p. 14—only *confirms* that the resale-buyer job is particularly ill-suited for frequent, *ad hoc* telecommuting.

Holding Ford's telecommuting policy against it, moreover, could perversely discourage employers from permitting telecommuting where it *is* appropriate. This Court has recognized that "if the ADA required employers to offer all disabled employees an accommodation that it provided 'to some employees as a matter of good faith,' then 'a good deed would effectively ratchet up liability.'"[30] Thus, as Judge McKeague explained, if Ford's generous policy is deemed to be a reason why it had to grant Harris's extreme request, then employers may "respond … by tightening their telecommuting policies in order to avoid legal liability, and count-

---

[29]  R.60-22, Telework Agmt., PgID 1173; R.66-21, Telework Agmts., PgID 1362.
[30]  *Smith*, 129 F.3d at 868 (citation omitted).

15

less employees who benefit from generous telecommuting policies will be adversely affected."[31]  Adopting the EEOC's position thus would harm the workers whom the EEOC seeks to protect.

### 3.     Harris's Opinion Cannot Defeat Summary Judgment.

The EEOC cites Harris's own testimony as proof that regular, in-person attendance was unnecessary for her resale-buyer job, Supp. Br. 4, but its reliance is misplaced, *see* Ford Br. 33-35.  The EEOC points to Harris's assertion that the "vast majority" of her interactions with others were done by phone, which it describes as a "statemen[t] of fact."[32]  But even taken at face value, Harris's account of how much time she spent in face-to-face interactions does not diminish the fact that *at any given time, on any given workday*, such in-person interactions might be essential to the effective performance of her job.  *Supra* pp. 9-11.[33]

To be sure, Harris stated that "[her] position did not *require* a lot of face-to-face communications."[34]  But this assertion merely reflects Harris's own vague opinion about what was actually *essential* for her job, and cannot defeat summary judgment.  Courts do not and should not "allow employees to define the essential

---

[31]  Op. 32 (McKeague, J., dissenting).

[32]  Supp. Br. 4 (citing R.66-3, Harris Decl. ¶ 3, PgID 1262-63).

[33]  *Cf. Dropinski v. Douglas Cnty.*, 298 F.3d 704, 709 (8th Cir. 2002) (even infrequent tasks may be essential).  The EEOC also cites an email that Harris sent about the denial of her telecommuting request.  Supp. Br. 4 (citing R.60-21, Apr. 22, 2009 Email, PgID 1171).  Harris's unsworn assertions in that email are not evidence about her job's requirements that can create a genuine dispute of fact.

[34]  R.66-3, Harris Decl. ¶ 7, PgID 1263 (emphasis added).

functions of their positions based solely on their personal viewpoint and experience."[35]  Otherwise, "any employee could provide a court with self-serving testimony that her job was amenable to telecommuting."[36]  Every litigant would opine that the disputed job function is not essential, and on that basis (and contrary to the employer's business judgment), every case would go to trial.

### 4. Summary Judgment Is Appropriate Where, As Here, The Evidence Demonstrates That Regular Attendance In The Workplace Is Essential.

That result—requiring every case concerning whether a job function is essential to be tried to a jury, based on an employee's say-so—is exactly what the EEOC appears to envision.  It urges the Court to leave all such questions to trial, even where (as here) the central issue is whether regular, physical attendance is essential.  Supp. Br. 3, 5.[37]  That cannot be squared with case law or common sense.

This Court has repeatedly affirmed rulings granting summary judgment on the very question whether attendance was essential for a job.  *See Brenneman*, 366

---

[35]  *Mason*, 357 F.3d at 1122.

[36]  Op. 27 (McKeague, J., dissenting) (internal quotation marks omitted).

[37]  Indeed, the EEOC now declines to say for certain whether refusing to allow Harris to telecommute up to four days per week on an *ad hoc* basis *actually* violated the ADA.  Supp. Br. 6.  That is puzzling, since the EEOC filed this suit alleging that Ford violated the ADA by refusing to allow Harris to telecommute (and sought punitive damages), *see* R.1, Compl. ¶¶ 8, F, PgID 3-4; R.9, Amended Compl. ¶¶ 8, F, PgID 26, 28, and it argued below that "attendance in the office is not an essential function" of Harris's resale-buyer job, R.66, EEOC S.J. Opp. 12, PgID 1247. In all events, the EEOC's suggestion that employers must go to trial because it "*might*" be possible to structure a job differently (Supp. Br. 6) is remarkable.

F.3d at 415, 418-19 ("plaintiff, as a matter of law, would not have been qualified to perform the essential functions … due to his excessive absenteeism"); *Gantt*, 143 F.3d at 1044, 1047 (because plaintiff could not attend work, "[t]here is no question of fact that [she] was not qualified"); *see also Melange*, 482 F. App'x at 82, 84-85. It has likewise affirmed a summary-judgment ruling that rejected as unreasonable a requested accommodation of working from home.  *See Smith*, 129 F.3d at 867.  It should do the same here, where the only conflicting "evidence" is Harris's opinion.

This case bears no resemblance to the cases cited by the EEOC as authority for its view that summary judgment is nearly always inappropriate.  In *Rorrer*, 743 F.3d 1025, there was conflicting evidence as to whether the employer ever adopted, much less relied upon, the job duties it claimed the employee could not perform.  *Id.* at 1041.  And "the record [was] clearly 'mixed' about whether," for the job at issue (a firefighter), the disputed function (driving emergency equipment) was essential; "direct evidence" showed that some firefighters "never" performed that task and that excusing one from it "would be 'very easy.'"  *Id.* at 1042. Likewise, in *Henschel*, 737 F.3d 1017, there was conflicting evidence on whether the function (hauling equipment) was essential:  While descriptions for *other* jobs included it, the *plaintiff's* job description did not, and eliminating the function would cause only "minimal consequences."  *Id.* at 1023.  Similarly, in *Solomon v. Vilsack*, 763 F.3d 1 (D.C. Cir. 2014), the employer "d[id] not deny" that, if a flexi-

ble schedule were otherwise reasonable, a "jury could conclude" that the plaintiff could "have performed all the essential functions of her job." *Id.* at 6, 9.[38]

Adopting the EEOC's view that disputes over whether functions are essential must nearly always go to trial also would be disastrous as a practical matter. It would mean that, whenever an employee raises issues about regular attendance, the employer must either endure the burdens of trial in order to prove that attendance is key to a particular job, or must surrender the efficiency of its business and excuse the employee from regular attendance requirements. For many employers, the costs and risks of litigation will create tremendous pressure to settle even meritless claims—indeed, claims like this one that are based on alleged conduct that even the EEOC (despite bringing suit) is now not entirely sure is unlawful, *cf.* Supp. Br. 6. And for employers who do go to trial, the EEOC's view transforms juries into "'super personnel department[s].'" *Mason*, 357 F.3d at 1122 (citation omitted).

### C.   It Was Harris's Burden To Propose Other Accommodations, And The Only Alternatives The EEOC Identifies Were Unworkable.

Unable to demonstrate that regular attendance is optional for the resale-buyer job—and thus that Harris's request to eliminate that requirement was rea-

---

[38] The employer also had allowed another worker in the same job to work a flexible schedule, and informally permitted the plaintiff to do so. 763 F.3d at 6. *Solomon*, moreover, did not overrule *Carr*, 23 F.3d 525, which recognized that "an essential function of any government job is an ability to appear for work," *id.* at 530. Instead, *Solomon* explained that the plaintiff's "frequent, unpredictable … absences" in *Carr* justified a different result in that case. 763 F.3d at 11.

sonable—the EEOC now argues that Harris actually sought (and Ford had to con-

sider) something very different:  Although Harris asked to work from home "up to

four days per week" on an *ad hoc* basis, the EEOC claims that her request actually

"embraced the possibility of some lesser number of days," and that Harris "would

have accepted a telework arrangement of only one to two days per week."  Supp.

Br. 1-2.  Had Ford pursued that less extreme alternative, the EEOC argues, it might

have reduced Harris's stress levels and thereby enabled "her to work in the office

on a more regular basis."  *Id.* at 6.  The EEOC's argument is flawed at every step.

Harris explicitly requested to telecommute "up to four days per week."[39]  Of

course, "up to four" means *as many as* four.  And, given Harris's attendance rec-

ord, Ford had every reason to believe that she would indeed work from home that

often.  From January to April 2009 (when Ford declined Harris's request), Harris

often missed four or more full or partial days per week.  *See* R.60-2, Gordon Decl.

¶ 10, PgID 1030-32.  In all of 2009, she worked only one full workweek, and

missed more than 50% of full workdays and some or all of 75% of workdays.  *See*

*id.*[40]  Her frequent absences led to mistakes and took a heavy toll on her coworkers

and supervisors, who "struggl[ed]" to shoulder Harris's work on top of their own.[41]

---

[39]  R.60-2, Gordon Decl. ¶ 12, PgID 1034; *see also* R.60-4, Jirik Decl. ¶¶ 8-9, PgID 1048-49; R.60-10, Feb. 19, 2009 Email, PgID 1100.
[40]  *See also* R.67-3, Harris Dep. 204 & Ex. 3, PgID 1388-89.
[41]  R.60-8, Pompey Decl. ¶ 4, PgID 1092-93; *see also* R.60-9, Radl Decl. ¶ 7, PgID 1098; R.60-2, Gordon Decl. ¶ 8, PgID 1029-30.

Moreover, even if Harris would have "accepted" an arrangement in which she was *not* telecommuting four days per week, or even two or three, Supp. Br. 1, it was *her* responsibility to propose that. The *employee* bears the burden of proposing an accommodation. *See Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010). Harris did not propose anything "other than the unpredictable 'up to four days per week' arrangement she described." R.60-4, Jirik Decl. ¶ 9, PgID 1049. The EEOC does not argue otherwise, citing only Harris's assertion that she would have accepted fewer telecommuting days "*[i]f Ford had offered*" that.[42]

Ford, in fact, *did* propose two reasonable accommodations: It offered to find Harris another job at Ford for which greater telecommuting would be possible, or to move her desk closer to the restroom. R.60-4, Jirik Decl. ¶ 9, PgID 1049. Harris, however, rejected both proposed accommodations. *Id.*[43] That independently dooms the EEOC's claim. Harris was not entitled to "make [Ford] provide a specific accommodation if another reasonable accommodation is instead provided." *Keever v. City of Middletown*, 145 F.3d 809, 812 (6th Cir. 1998) (internal quotation marks omitted). The *employer* "'has the ultimate discretion to choose between effective accommodations.'" *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996) (citation omitted). Even the EEOC has agreed that an employer may "select

---

[42] R.66-3, Harris Decl. ¶ 17, PgID 1264 (emphasis added); *see* Supp. Br. 1.
[43] Harris declined other practical solutions such as bringing a change of clothes or using protective undergarments. *See* R.60-6, Harris Dep. 144-49, PgID 1060-62.

any effective accommodation, even if it is not the one preferred by the employee," in place of telecommuting.[44]   The EEOC did not show that the alternatives Ford offered were ineffective.  Its claim fails for that reason alone.  Ford Br. 40-42.

In any event, permitting Harris to work from home even one or two days per week would not have solved the basic problem that her in-person attendance would be entirely "unpredictable."  R.60-2, Gordon Decl. ¶¶ 10-12, PgID 1030-34; R.60-4, Jirik Decl. ¶ 8, PgID 1048.  Harris never proposed telecommuting on "specified days" (Supp. Br. 1), as other employees at Ford must do, apparently because that was not possible:  According to Harris, her symptoms surfaced without warning and could last for "hours," "days," or "a week" at a time.  R.67-3, Harris Dep. 140-42, PgID 1384-85.  If neither she nor Ford could predict when she would be at work, scheduling timely face-to-face meetings and visits would be very difficult, and Ford could not count on Harris to be present to solve problems in person.

The EEOC's claim that allowing Harris to telecommute even on a less-frequent basis might have reduced her stress levels and thus enabled her to attend work more regularly (Supp. Br. 2, 6, 8) is thus a nonstarter:  Without regular, reliable attendance at her worksite, Harris could not perform critical parts of her job.  The EEOC's claim is also belied by the record.  For instance, Harris took a lengthy leave of absence from October 2004 to February 2005; yet after returning to work,

---

[44]  *Work at Home/Telework as a Reasonable Accommodation*, *supra*, Question #6.

her attendance remained abysmal.  *See* R.60-3, Gontko Decl. ¶ 3, PgID 1043.  And, among other accommodations, Ford also twice allowed Harris, on a trial basis, to work from home on an *ad hoc* schedule.  *Id*.  The trials failed.  Harris could not "establish regular and consistent work hours" or perform "core objectives of the job."[45]  But even if telecommuting at will would have made the job less stressful, employers are not required to provide employees a "virtually stress-free environ-ment"[46]—least of all employees whose job is to solve pressing, urgent problems.

It is no answer to invoke the general principle that "'preferences will some-times prove necessary'" to comply with the ADA.[47]  The issue here is not whether employers sometimes must make exceptions to disability-neutral policies.  It is whether Harris could perform her job's essential functions—which often included impromptu, face-to-face interactions—working from home on an *ad hoc* basis.  The record demonstrates that she could not.  And the only accommodation she re-quested would not enable her to do so, but would eliminate that duty altogether.

The district court was therefore correct to grant summary judgment on the discrimination claim.  That straightforward conclusion should be affirmed.

---

[45]  R.60-3, Gontko Decl. ¶¶ 3, 5, PgID 1043; R.60-7, Gontko Dep. 20, PgID 1089.
[46]  *Pesterfield v. TVA*, 941 F.2d 437, 442 (6th Cir. 1991).
[47]  Supp. Br. 6 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002)). *But cf. Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 483 (8th Cir. 2007) (holding that, even under *U.S. Airways*, "the ADA is not an affirmative action statute").

## II.    THE RECORD CASTS NO DOUBT ON FORD'S REASON FOR TERMINATING HARRIS: POOR PERFORMANCE.

The EEOC's en banc brief offers no reason to overturn the district court's grant of summary judgment on the retaliation claim. That ruling should be affirmed for the reasons stated in Ford's panel-stage brief. Ford Br. 42-46. To prove retaliation, the EEOC had to show that Harris was terminated "because" of her EEOC charge, 42 U.S.C. § 12203(a), which requires proof that a "desire to retaliate was the *but-for cause* of" her termination.[48] Ford's "proffered reason" for terminating Harris—poor performance—thus "cannot be proved to be pretext 'unless it is shown *both* that the reason was false, *and* that … retaliation was the reason.'"[49] The record is clear that Ford terminated Harris due to her poor performance and was justified in doing so. R.68, S.J. Order 13-14, PgID 1402-03.

The EEOC's rejoinders in its panel-stage reply—like the panel's analysis of the retaliation claim, Op. 19-22—rest on its erroneous view that Ford's rejection of Harris's telecommuting demand was improper.[50] And the EEOC's suggestion, Reply 13-14 (D.E.49), echoed in the panel opinion, Op. 21, that Ford itself was to blame for Harris's failure to address the backlog in her work—one of the perfor-

---

[48] *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013) (emphasis added); *see also Feist v. La. Dep't of Justice*, 730 F.3d 450, 454 (5th Cir. 2013).

[49] *Harris v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 486 (6th Cir. 2010) (brackets and citation omitted).

[50] Reply 13, 15 (D.E.49) (attributing Harris's performance woes to denial of her telecommuting request, and critiquing Ford's attendance policy as "irrational").

mance goals in Harris's Performance Enhancement Plan that she failed to meet—ignores the fact that Harris (as the panel conceded) "failed to achieve *any* of the objectives identified in the plan." *Id.* at 20 (emphasis added).

The EEOC's further claim that Harris was "consistently rated" positively before filing her charge (Reply 12 (D.E.49)) is false. The "exceptional plus" rating she received before 2009 was given to *80%* of workers and was the "'default' rating" for resale buyers. R.60-2, Gordon Decl. ¶ 13, PgID 1035. More detailed reviews placed Harris in the bottom 22% of her peers in 2007 and the bottom *10%* in 2008. *See id.* Reviews of specific skills confirmed this: Harris received the second-lowest rating in 7 out of 11 skill areas in 2007, and in 9 out of 11 skill areas in 2008. R.60-4, Jirik Decl. ¶ 16, PgID 1052. Her performance only "worsened" in 2009. R.60-2, Gordon Decl. ¶ 14, PgID 1035. In April 2009, she made a significant pricing error while working remotely, which she "did not correct" even when it was called to her attention. *Id.* ¶¶ 16-17, PgID 1036-37; Ford Br. 15-16.

The record, in short, establishes beyond doubt that Ford properly terminated Harris because of her poor performance, not retaliation. The district court thus correctly granted summary judgment to Ford on the retaliation claim as well.

## CONCLUSION

For these reasons stated and those explained in Ford's panel-stage brief, the district court's decision should be affirmed in all respects.

Dated:  October 29, 2014

Respectfully submitted,

_____/s/  Helgi C. Walker_____

Elizabeth P. Hardy
KIENBAUM OPPERWALL HARDY
  & PELTON, P.L.C.
280 North Old Woodward Avenue
Suite 400
Birmingham, Michigan 48009
(248) 645-0000

Helgi C. Walker
   *Counsel of Record*
Jonathan C. Bond
Marisa C. Maleck
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 955-8500
HWalker@gibsondunn.com

*Counsel for Appellee Ford Motor Company*

# STATUTORY AND REGULATORY ADDENDUM

## 42 U.S.C. § 12111.  Definitions

As used in this subchapter:

### (1) Commission

The term "Commission" means the Equal Employment Opportunity Commission established by section 2000e-4 of this title.

### (2) Covered entity

The term "covered entity" means an employer, employment agency, labor organization, or joint labor-management committee.

### (3) Direct threat

The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.

### (4) Employee

The term "employee" means an individual employed by an employer. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States.

### (5) Employer

#### (A) In general

The term "employer" means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, for two years following the effective date of this subchapter, an employer means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year, and any agent of such person.

A-1

**(B) Exceptions**

The term "employer" does not include—

(i) the United States, a corporation wholly owned by the government of the United States, or an Indian tribe; or

(ii) a bona fide private membership club (other than a labor organization) that is exempt from taxation under section 501(c) of Title 26.

**(6) Illegal use of drugs**

**(A) In general**

The term "illegal use of drugs" means the use of drugs, the possession or distribution of which is unlawful under the Controlled Substances Act [21 U.S.C. 801 et seq.]. Such term does not include the use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law.

**(B) Drugs**

The term "drug" means a controlled substance, as defined in schedules I through V of section 202 of the Controlled Substances Act [21 U.S.C. 812].

**(7) Person, etc.**

The terms "person", "labor organization", "employment agency", "commerce", and "industry affecting commerce", shall have the same meaning given such terms in section 2000e of this title.

**(8) Qualified individual**

The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's

A-2

judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

**(9) Reasonable accommodation**

The term "reasonable accommodation" may include—

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

**(10) Undue hardship**

**(A) In general**

The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).

**(B) Factors to be considered**

In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include—

(i) the nature and cost of the accommodation needed under this chapter;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

## 42 U.S.C. § 12112.  Discrimination

### (a) General rule

No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

### (b) Construction

As used in subsection (a) of this section, the term "discriminate against a qualified individual on the basis of disability" includes—

(1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;

(2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs);

(3) utilizing standards, criteria, or methods of administration—

      (A) that have the effect of discrimination on the basis of disability; or

      (B) that perpetuate the discrimination of others who are subject to common administrative control;

(4) excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association;

      (5) (A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

      (B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;

(6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity; and

(7) failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure).

**(c) Covered entities in foreign countries**

**(1) In general**

It shall not be unlawful under this section for a covered entity to take any action that constitutes discrimination under this section with respect to an employee in a workplace in a foreign country if compliance with this section would cause such covered entity to violate the law of the foreign country in which such workplace is located.

**(2) Control of corporation**

**(A) Presumption**

If an employer controls a corporation whose place of incorporation is a foreign country, any practice that constitutes discrimination under this section and is engaged in by such corporation shall be presumed to be engaged in by such employer.

**(B) Exception**

This section shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer.

**(C) Determination**

For purposes of this paragraph, the determination of whether an employer controls a corporation shall be based on—

(i) the interrelation of operations;

(ii) the common management;

(iii) the centralized control of labor relations; and

(iv) the common ownership or financial control,

of the employer and the corporation.

**(d) Medical examinations and inquiries**

**(1) In general**

The prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries.

**(2) Preemployment**

**(A) Prohibited examination or inquiry**

Except as provided in paragraph (3), a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability.

**(B) Acceptable inquiry**

A covered entity may make preemployment inquiries into the ability of an applicant to perform job-related functions.

**(3) Employment entrance examination**

A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if—

(A) all entering employees are subjected to such an examination regardless of disability;

(B) information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that—

(i) supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

(ii) first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

(iii) government officials investigating compliance with this chapter shall be provided relevant information on request; and

(C) the results of such examination are used only in accordance with this subchapter.

## (4) Examination and inquiry

### (A) Prohibited examinations and inquiries

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

### (B) Acceptable examinations and inquiries

A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.

### (C) Requirement

Information obtained under subparagraph (B) regarding the medical condition or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3).

**42 U.S.C. § 12203.  Prohibition against retaliation and coercion**

**(a) Retaliation**

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

**(b) Interference, coercion, or intimidation**

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

**(c) Remedies and procedures**

The remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III of this chapter, respectively.

**29 C.F.R. § 1630.2  Definitions**

(a) *Commission* means the Equal Employment Opportunity Commission established by section 705 of the Civil Rights Act of 1964 (42 U.S.C. 2000e–4).

(b) *Covered Entity* means an employer, employment agency, labor organization, or joint labor management committee.

(c) *Person, labor organization, employment agency, commerce and industry affecting commerce* shall have the same meaning given those terms in section 701 of the Civil Rights Act of 1964 (42 U.S.C. 2000e).

(d) *State* means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the Virgin Islands, the

Trust Territory of the Pacific Islands, and the Commonwealth of the Northern Mariana Islands.

(e) *Employer*—(1) *In general*. The term *employer* means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, from July 26, 1992 through July 25, 1994, an employer means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year and any agent of such person.

(2) *Exceptions*. The term employer does not include—

(i) The United States, a corporation wholly owned by the government of the United States, or an Indian tribe; or

(ii) A bona fide private membership club (other than a labor organization) that is exempt from taxation under section 501(c) of the Internal Revenue Code of 1986.

(f) *Employee* means an individual employed by an employer.

(g) *Definition of "disability."*

(1) *In general. Disability* means, with respect to an individual—

(i) A physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(ii) A record of such an impairment; or

(iii) Being regarded as having such an impairment as described in paragraph (l) of this section. This means that the individual has been subjected to an action prohibited by the ADA as amended because of an actual or perceived impairment that is not both "transitory and minor."

(2) An individual may establish coverage under any one or more of these three prongs of the definition of disability, i.e., paragraphs (g)(1)(i)

(the "actual disability" prong), (g)(1)(ii) (the "record of" prong), and/or (g)(1)(iii) (the "regarded as" prong) of this section.

(3) Where an individual is not challenging a covered entity's failure to make reasonable accommodations and does not require a reasonable accommodation, it is generally unnecessary to proceed under the "actual disability" or "record of" prongs, which require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. In these cases, the evaluation of coverage can be made solely under the "regarded as" prong of the definition of disability, which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. An individual may choose, however, to proceed under the "actual disability" and/or "record of" prong regardless of whether the individual is challenging a covered entity's failure to make reasonable accommodations or requires a reasonable accommodation.

NOTE TO PARAGRAPH (g): See § 1630.3 for exceptions to this definition.

(h) *Physical or mental impairment* means—

(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

(*i*) *Major life activities*—(1) *In general*. Major life activities include, but are not limited to:

(i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working; and

(ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal

cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system.

(2) In determining other examples of major life activities, the term "major" shall not be interpreted strictly to create a demanding standard for disability. ADAAA section 2(b)(4) (Findings and Purposes). Whether an activity is a "major life activity" is not determined by reference to whether it is of "central importance to daily life."

(j) *Substantially limits*—

(1) *Rules of construction.* The following rules of construction apply when determining whether an impairment substantially limits an individual in a major life activity:

(i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

(ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

(iii) The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

(iv) The determination of whether an impairment substantially limits a major life activity requires an individualized assessment.

However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.

(v) The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.

(vi) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

(vii) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(viii) An impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment.

(ix) The six-month "transitory" part of the "transitory and minor" exception to "regarded as" coverage in § 1630.15(f) does not apply to the definition of "disability" under paragraphs (g)(1)(i) (the "actual disability" prong) or (g)(1)(ii) (the "record of" prong) of this section. The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section.

(2) *Non-applicability to the "regarded as" prong*. Whether an individual's impairment "substantially limits" a major life activity is not relevant to coverage under paragraph (g)(1)(iii) (the "regarded as" prong) of this section.

(3) *Predictable assessments*—(i) The principles set forth in paragraphs (j)(1)(i) through (ix) of this section are intended to provide for more generous coverage and application of the ADA's prohibition on discrimination through a framework that is predictable, consistent, and workable for all individuals and entities with rights and responsibilities under the ADA as amended.

(ii) Applying the principles set forth in paragraphs (j)(1)(i) through (ix) of this section, the individualized assessment of some types of impairments will, in virtually all cases, result in a determination of coverage under paragraphs (g)(1)(i) (the "actual disability" prong) or (g)(1)(ii) (the "record of" prong) of this section. Given their inherent nature, these types of impairments will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity. Therefore, with respect to these types of impairments, the necessary individualized assessment should be particularly simple and straightforward.

(iii) For example, applying the principles set forth in paragraphs (j)(1)(i) through (ix) of this section, it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: Deafness substantially limits hearing; blindness substantially limits seeing; an intellectual disability (formerly termed mental retardation) substantially limits brain function; partially or completely missing limbs or mobility impairments requiring the use of a wheelchair substantially limit musculoskeletal function; autism substantially limits brain function; cancer substantially limits normal cell growth; cerebral palsy substantially limits brain function; diabetes substantially limits endocrine function; epilepsy substantially limits neurological function; Human Immunodeficiency Virus (HIV) infection substantially limits immune function; multiple sclerosis substantially limits neurological function; muscular dystrophy substantially limits neurological function; and major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia substantially limit brain function. The types of impairments described in this section may substantially limit additional major life activities not explicitly listed above.

(4) *Condition, manner, or duration*—

(i) At all times taking into account the principles in paragraphs (j)(1)(i) through (ix) of this section, in determining whether an individual is substantially limited in a major life activity, it may be useful in appropriate cases to consider, as compared to most people in the general population, the condition under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity.

(ii) Consideration of facts such as condition, manner, or duration may include, among other things, consideration of the difficulty, effort, or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; and/or the way an impairment affects the operation of a major bodily function. In addition, the non-ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity.

(iii) In determining whether an individual has a disability under the "actual disability" or "record of" prongs of the definition of disability, the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population.

(iv) Given the rules of construction set forth in paragraphs (j)(1)(i) through (ix) of this section, it may often be unnecessary to conduct an analysis involving most or all of these types of facts. This is particularly true with respect to impairments such as those described in paragraph (j)(3)(iii) of this section, which by their inherent nature should be easily found to impose a substantial limitation on a

A-15

major life activity, and for which the individualized assessment should be particularly simple and straightforward.

(5) *Examples of mitigating measures*—Mitigating measures include, but are not limited to:

(i) Medication, medical supplies, equipment, or appliances, low-vision devices (defined as devices that magnify, enhance, or otherwise augment a visual image, but not including ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aid(s) and cochlear implant(s) or other implantable hearing devices, mobility devices, and oxygen therapy equipment and supplies;

(ii) Use of assistive technology;

(iii) Reasonable accommodations or "auxiliary aids or services" (as defined by 42 U.S.C. 12103(1));

(iv) Learned behavioral or adaptive neurological modifications; or

(v) Psychotherapy, behavioral therapy, or physical therapy.

(6) *Ordinary eyeglasses or contact lenses—defined*. Ordinary eyeglasses or contact lenses are lenses that are intended to fully correct visual acuity or to eliminate refractive error.

(k) *Has a record of such an impairment*—

(1) *In general*. An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(2) *Broad construction*. Whether an individual has a record of an impairment that substantially limited a major life activity shall be construed broadly to the maximum extent permitted by the ADA and should not demand extensive analysis. An individual will be considered to have a record of a disability if the individual has a history of an impairment that substantially limited one or more major life activities when compared to most peo-

ple in the general population, or was misclassified as having had such an impairment. In determining whether an impairment substantially limited a major life activity, the principles articulated in paragraph (j) of this section apply.

(3) *Reasonable accommodation*. An individual with a record of a substantially limiting impairment may be entitled, absent undue hardship, to a reasonable accommodation if needed and related to the past disability. For example, an employee with an impairment that previously limited, but no longer substantially limits, a major life activity may need leave or a schedule change to permit him or her to attend follow-up or "monitoring" appointments with a health care provider.

(*l*) *"Is regarded as having such an impairment."*  The following principles apply under the "regarded as" prong of the definition of disability (paragraph (g)(1)(iii) of this section) above:

(1) Except as provided in § 1630.15(f), an individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity. Prohibited actions include but are not limited to refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment

(2) Except as provided in § 1630.15(f), an individual is "regarded as having such an impairment" any time a covered entity takes a prohibited action against the individual because of an actual or perceived impairment, even if the entity asserts, or may or does ultimately establish, a defense to such action.

(3) Establishing that an individual is "regarded as having such an impairment" does not, by itself, establish liability. Liability is established under title I of the ADA only when an individual proves that a covered entity discriminated on the basis of disability within the meaning of section 102 of the ADA, 42 U.S.C. 12112.

(m) The term "*qualified*," with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and

other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position. See § 1630.3 for exceptions to this definition.

(n) *Essential functions*—(1) *In general*. The term *essential functions* means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.

(2) A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

(*o*) *Reasonable accommodation*.

(1) The term *reasonable accommodation* means:

(i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or

(ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or

(iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

(2) *Reasonable accommodation* may include but is not limited to:

(i) Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(ii) Job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities.

(3) To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

(4) A covered entity is required, absent undue hardship, to provide a reasonable accommodation to an otherwise qualified individual who meets the definition of disability under the "actual disability" prong (paragraph (g)(1)(i) of this section), or "record of" prong (paragraph (g)(1)(ii) of this section), but is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the "regarded as" prong (paragraph (g)(1)(iii) of this section).

(p) *Undue hardship*—(1) *In general. Undue hardship* means, with respect to the provision of an accommodation, significant difficulty or expense incurred by a covered entity, when considered in light of the factors set forth in paragraph (p)(2) of this section.

(2) *Factors to be considered*. In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include:

(i) The nature and net cost of the accommodation needed under this part, taking into consideration the availability of tax credits and deductions, and/or outside funding;

(ii) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;

(iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities;

(iv) The type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and

(v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to per-

form their duties and the impact on the facility's ability to conduct business.

(q) *Qualification standards* means the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired.

(r) *Direct Threat* means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

(1) The duration of the risk;

(2) The nature and severity of the potential harm;

(3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm.

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2014, an electronic copy of the foregoing was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the appellate CM/ECF system.

I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.



/s/ Helgi C. Walker

Helgi C. Walker